19 C.C.P.A. (Patents)

**OAKES et al. v. MARTIN et al.**

**Patent Appeal No. 4613.**

Court of Customs and Patent Appeals.
July 6, 1942.

William H. Abbott, of Chicago, Ill., and Charles S. Grindle, of Washington, D. C., for appellants.

George E. Stebbins, of Pittsburgh, Pa., for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

Appellants here seek reversal of the decision of the Board of Appeals of the United States Patent Office, affirming the decision of the Examiner of Interferences, awarding priority to appellees in an interference declared between applications for patents relating to a type of articles, or discs, intended for use in abrasing metal surfaces. We quote the following from the decision of the Examiner of Interferences:

"The invention involves abrasive sheets in the nature of sandpaper and a method of producing these sheets.

"In manufacturing automobile bodies the body shells are formed from several pressed steel parts which are welded together. In order to get a smooth joint the seams are filled with lead solder. After soldering the seam is abraded with an abrading disc. This abrading action pulverizes the lead and the air becomes filled with a lead laden dust. Workers in the body plants inhaling the dust are subject to lead poisoning.

"To overcome this costly as well as dangerous hazard, the abrading operation must be carried on under a water spray to lay the dust. Up to the time that work began on this invention, the abrasive sheets used in the form of discs were made with a glue bond to secure the laminations of the sheets together and to cement the abrasive grain to the sheet. Under the water spray the glue becomes soft due to its water solubility and the discs are rendered unfit for use much before the termination of their normally effective life.

"To meet this problem abrasive industries began efforts to produce suitable waterproof abrading discs such as those defined by the counts in issue."

Four counts are involved. The first is a method count, reading: "1. The method of making flexible abrasive articles of the nature of sandpaper which comprises im-

pregnating a sheet of non-metallic fabric with a liquid resinous material, applying a sheet of unimpregnated non-metallic fabric to one side of said impregnated sheet of fabric and adhesively uniting it therewith to form a laminated backing having one face formed by the impregnated fabric and the other face by the unimpregnated fabric, and thereafter applying a liquid resinous material to the unimpregnated fabric face, applying a layer of abrasive grain substantially one grain thick to such resinous coating, and heat-hardening the liquid resinous material."

The others are counts defining the article. Of these, count 2 is illustrative. It reads: "2. A flexible abrasive disc comprising a backing consisting of a sheet of heat-hardened phenolic resin containing a non-metallic reinforcement embedded within it and a layer of cloth firmly attached to a surface of the resin sheet, and a substantially single layer of abrasive grains bonded to the cloth by a heat-hardened phenolic resin, said disc being characterized by sufficient strength and stiffness so that it is adapted to be driven from the center alone while being resiliently supported and by sufficient flexibility so that it can be bent while being applied to a workpiece in such a way that only a portion of the disc is in contact with the work at any given time and the remainder of the disc is disposed at an angle with respect to the working portion."

All the counts originated in the application of appellees which was filed July 9, 1936, and which was assigned to the Carborundum Company. The application of appellants (which was assigned to the Minnesota Mining and Manufacturing Company) was filed June 10, 1939. The burden, therefore, rested upon appellants to establish priority by a preponderance of the evidence, and evidence was introduced on their behalf in the effort to show that they completed the invention at least as early as July, 1935. No evidence was offered on behalf of appellees. So, they are restricted to their filing date.

As a part of the history of the case we quote the following from the decision of the Examiner of Interferences:

"The present interference was instituted as a result of a motion in interference No. 75,245, Cross v. Newcomb and Stratford, involving applications owned by the same parties in interest as are involved in this interference.

"On September 26, 1938, the Carborundum Company, assignee of Newcomb et al., moved for an interference between Cross and the Martin and Aust application involved in this interference. The motion was granted in part and after interlocutory proceedings the party Cross was given until June 12, 1939, to make the count referred to in the final decision on the motions. On June 10, 1939, the Oakes et al. application was filed and election to contest the issue with that application was made."

The board found that appellants had shown conception of all the counts in May and June, 1935. The finding was based upon a series of experiments, or tests, made in the laboratory of the Minnesota Mining and Manufacturing Company, together with others made in the plant of a company (Briggs Body Company) engaged in the manufacture of automobile bodies, at Detroit, Michigan. The finding as to conception is not challenged by appellees. The respective tribunals of the Patent Office, however, concurred in the view that the tests so made were not sufficient to constitute reduction to practice and that no effort had been made by appellants to prove diligence during the critical period. Before us appellants make no claim to diligence but rest their case entirely upon the contention that the tests were sufficient to meet the requirements governing actual reduction to practice.

From the foregoing it will be seen that the controversy as it comes before us is limited in scope. The brief on behalf of appellants states: "The matters in dispute between the parties are relatively limited and therefore the issues before this Court are few in number. The principal issue before the Court is whether or not the abrasive discs made in May and June, 1935, by appellants in the plant of the Minnesota Mining & Manufacturing Company in Saint Paul, Minnesota, and which were tested both in that plant and in automobile plants in Detroit, Michigan, were tested sufficiently to establish an actual reduction to practice."

Certain of the reasons of appeal before us seem to be based upon the theory that the board held that commercial production, or making and testing the abrasives "on a commercial scale," was necessary to constitute actual reduction to practice, and considerable argument on this point is presented in appellants' brief.

We do not think the board's decision admits of that interpretation. Both the Examiner of Interferences and the board analyzed the evidence with much care, and quoted parts of it literally. We note that in certain of the questions asked Mr. Kugler (quoted in the board's decision) upon cross-examination, counsel for appellees used the phrase "commercial quality" several times, and that the answers to such questions seem to indicate that the witness did not regard some, at least, of the discs tested as being of a commercial standard, but we fail to find in the board's decision anything indicating that its conclusion was based upon that evidence, or that, as is alleged, in effect, in one of the reasons of appeal, it established the "high standard of commercial acceptability" as the test governing actual reduction to practice.

The board did hold, "Obviously, it required a considerable amount of testing under actual working conditions to demonstrate that the discs would fulfill their intended purpose," and appellants claim that that holding was erroneous.

We think it was clearly correct.

While the counts at issue do not apply the term "waterproof" to the discs, those were concededly the kind of discs which the appellants were trying to develop. That is to say, they were trying to develop discs which could be used for grinding or abrading metal surfaces under water. This, as the board said, "was something new and there was nothing in the prior practice to indicate what kind of discs would be satisfactory under this condition."

In presenting the case before us counsel for appellants suggest that, since the counts are not limited in terms to articles used in wet grinding, a showing that they were satisfactorily tested in dry grinding should be accepted as constituting reduction to practice. This may be conceded. That is to say, if the discs had been sufficiently tested in dry grinding, under actual working conditions, the requirement of the counts would have been met. Since, however, certain of the materials embodied in the involved discs differed from those embodied in the discs then being used in dry grinding, it, of course, was necessary that a "considerable amount of testing under actual working conditions" be made. In other words, the observation of the board applies with equal force whether the

tests were made in wet grinding or in dry grinding.

Articles used in industry for abrading metal surfaces, in order to be of practical utility, must be capable of severe usage. The brief on behalf of appellants states: "In use, the discs are mounted on a rotatable spindle and are rotated very rapidly, as high as 3500 revolutions per minute. The discs are pressed against the body to be abraded at an angle so that the grinding is done on a band about 2 inches wide extending inwardly from the periphery of the disc. Because of the severe nature of this type of abrading at high speeds, discs do not last long and a great number are used each day on a single machine."

The history of appellants' activities is set forth in the decision of the Examiner of Interferences as follows:

"The record for the junior party establishes that during the spring of 1935 work was begun by them in the research laboratories of the Minnesota Mining and Manufacturing Company on the problem raised by the lead dust conditions in the automobile body plants.

"Fabric sheets impregnated with a heat treated resin were obtained from the National Vulcanized Fibre Company. To these sheets was bonded by means of a resinous adhesive a layer of unimpregnated cloth. This laminated fabric was then treated by applying a bonding coat of resin to the untreated layer and to this was added a coating of a suitable abrasive grain.

"Difficulty was experienced in keeping the two cloth layers from peeling or separating and the untreated cloth was thereafter sent to the National Vulcanized Fibre Company to be attached to the treated fabric at their plant. A sample of the resulting material is in evidence as Oakes et al. exhibit 3.

"The combined sheets were obtained during May, 1935, as shown by Oakes et al. exhibit 17. Sheets like exhibit 3 were coated with a resin bond and abrasive grain added to make abrasive sheets which were cut into disc form after suitable heat treatment. Examples of the discs are in evidence (Oakes et al. exhibits 9 and 10).

"The finished discs were tested in the laboratory of the Minnesota Mining and Manufacturing Company and the results of the tests were recorded in a notebook by the joint applicant McNamara.

724

"The tests were allegedly sufficiently promising to warrant field testing by the automobile body manufacturers in their plants. Accordingly, sixteen discs were shipped to Detroit as shown by Oakes et al. exhibit 13, a letter referring to the shipment.

"The witness McCormick, Detroit sales representative, received the discs and had some of them tested at the plant of the Briggs Body Company. Four of the discs tested were returned to the laboratory and a report was made thereon by McCormick (exhibits 14 and 15)."

We have very carefully examined the record in the case and, from such examination, we are thoroughly satisfied that the respective tribunals of the Patent Office did likewise, and that in their decisions they stated the pertinent facts fairly and in sufficient detail.

We first discuss the laboratory experiments, or tests, made in the plant of the Minnesota Mining and Manufacturing Company upon which appellants, in part, rely. They seem to have been seven in number and the result obtained was made a matter of record in notes, or reports, prepared at the time of each test. Of these tests the board said: "It is clear from the conclusions noted in connection with each experiment that the discs tested were not satisfactory. The principal difficulty seems to have been with the bond as the cloth peeled away from the back of the discs. Furthermore, the mineral and bond peeled off very readily."

As to the correctness of this finding we have not the slightest question, having fully examined the notations made (together with the testimony concerning them) in the light of appellants' arguments respecting them.

The board further declared that the "difficulty with the bond was never overcome during the entire experimental period." Some of the evidence supporting this statement was quoted literally, and such as was not so quoted was fairly and succinctly paraphrased.

We turn now to the tests made at the plant of the Briggs Body Company in Detroit, in June, 1935, which, apparently, were the only ones made under actual working conditions.

While sixteen discs were shipped to that company, it is not established that more than four of them were tested, and of the four only two conformed to the counts, each of which counts contains a limitation such as that expressed in count 2, supra, by the language "a substantially *single* layer of abrasive grains bonded to the cloth" (italics ours), and two of those tested at the Detroit plant were double coated.

The only person called as a witness with respect to those tests was Mr. Lawrence R. McCormick, who described himself as a "general line salesman" for appellants' assignee, and the situation, unfortunate for appellants, is that, as we view his testimony (and as the tribunals below viewed it), it does not show a state of facts sufficient to constitute reduction to practice of the invention.

It has been stated that abrasive discs are subjected to severe usage. In the brief for appellants, as already quoted, supra, it is stated that "discs do not last long and a great number are used each day on a single machine." It does not seem reasonable to us to conclude that reduction to practice was established by testing only two of the articles.

Furthermore, the testimony of Mr. McCormick, when considered as a whole, falls far short of establishing that the two tests made could be accepted as satisfactory even should it be assumed that two would be sufficient. The Examiner of Interferences pointed out (we omit the references to the pages of the record) that: "McCormick states that while the test showed some promise, that is 'it was a good flash test,' further testing was required. No further tests were made. McCormick is not really able to state exactly how much testing was done. He is not certain whether he can now properly interpret his notes and his report. He was unable to state definitely whether the discs were good."

Also the Examiner of Interferences correctly stated: "The witness Kugler though not present in Detroit when the tests were made stated upon examining the discs tested that they showed evidences of failure of the bond as had the disc tested in the laboratory."

We have not quoted at any great length from the evidence in the case, nor have we undertaken to paraphrase the detailed testimony, because we deem it unnecessary to lengthen this opinion by so doing, since we are in agreement with the tribunals be-

low respecting the findings of fact and the conclusion based upon such findings.

The decision of the Board of Appeals is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.